# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

JENNIFER M. GIEBE,         )
                                  )
           Plaintiff,         )
                                  )
vs.                           )    Case No. 4:09CV01191 AGF
                                  )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,   )
                                  )
           Defendant.       )

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Jennifer M. Giebe's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or supplemental security income under Title XVI of the Act, id. §§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on March 1, 1972, filed for benefits on February 27, 2006, at the age of 34, alleging a disability onset date of July 1, 2004, due to migraine headaches, depression, and Graves' disease.[1] After Plaintiff's application was denied at the initial administrative level, she requested a hearing before an Administrative Law Judge ("ALJ") and such a hearing was held on January 6, 2009, at which Plaintiff and a vocational expert ("VE") testified. At the time of the hearing, Plaintiff amended her

_____

[1]Graves' disease is the most common form of hypothyroidism, occurring when your immune system mistakenly attacks your thyroid gland and causes it to overproduce the hormone thyroxine. See http://www.mayoclinic.com/health/graves-disease/DS00181.

alleged onset date to May 8, 2008.

By decision dated February 18, 2009, the ALJ found that Plaintiff could not perform her past relevant work, but that, given her age, experience, and residual functional capacity ("RFC"), there were other jobs she could perform, and therefore, she was not disabled under the Act. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on June 26, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision was not based upon substantial evidence because the ALJ failed to properly assess Plaintiff's credibility and because the ALJ failed to fully and fairly develop the record. Plaintiff requests that the ALJ's decision be amended to a fully favorable decision, or alternatively, remanded for further development of the record.

## **BACKGROUND**

### **Work History and Application Form**

The record indicates inconsistencies between Plaintiff's Work History Report dated April 11, 2006, and her social security earnings records. Plaintiff reported that she worked full-time for several hotels, at the front desk, as a night auditor and as a front desk manager from 1989 until 1998, earning $8.65 per hour. (Tr. 178-79.) Her social security earnings report indicates that she worked in hotels from 1990 until 1997 with annual earnings that fluctuated between approximately $7,000 and $17,000. (Tr. 133-34.)

Plaintiff reported that she worked full-time as an accounting clerk earning $10 per hour between 1998 and 2000. (Tr. 178-80.) Her social security earnings report indicates that she worked as an accounting clerk in 1997 and 1998 with annual earnings of approximately $8,500 and $18,500, respectively. According to her social security earnings report, she then worked staffing jobs in 1999, earning approximately $13,000 in annual income. (Tr. 134-35.)

Plaintiff reported that she worked for a chemical company between 2001 and 2003, first as a temporary accounting worker and then as a full-time purchasing agent, earning $15 per hour. (Tr. 178-81.) Her social security earnings report indicates that she worked for the chemical company in 2000 and 2001, with annual earnings of approximately $27,000 and $13,000, respectively. She then worked as a claims representative for an unemployment claims consulting company from 2001 to 2003, earning between $7,000 and $26,500 annually. (Tr. 135-36.) After 2003, Plaintiff's reported employment history matches her social security earnings report. From 2003 to 2004, Plaintiff worked a series of temporary clerical jobs between 12 and 24 hours per week, earning $10 per hour. Between 2004 and 2006, she worked as a waitress full-time for $2.13 per hour plus tips. (Tr. 178-85.) From 2006 until May 8, 2008, Plaintiff worked full-time as a collections agent, earning between $12.25 and $12.55 per hour. (Tr. 34-35, 137-38, 301.)

Earnings records indicate that between 1989 and 1992, Plaintiff earned between $3,000 and $12,500. From 1993 until 2003, Plaintiff earned between $13,000 and $30,000 with the exception of 1995, when she earned $9,000. In 2004 and 2005, she

3

earned $7,600 and $8,600, respectively.  In 2006, she earned $13,000 and in 2007, she earned $33,000.  (Tr. 131.)

**Medical Record**

On February 11, 2003, Plaintiff  was examined by Justin Hugo, M.D., at St. John's Mercy Family Medicine, whose notes indicated that she had a history of Graves' disease. Plaintiff reported that she had a history of migraines, and was diagnosed eight years ago. She reported a headache that had lasted for one week, but did not have any photophobia or phonophobia.  She had been taking Advil migraine and Excedrin migraine daily for the past two years, and was recently prescribed Fioricet with codeine, which she had been taking every four to six hours.  Plaintiff was assessed with a rebound headache, and advised to stop all pain medication, including over-the-counter medication.  She was set on a prednisone taper for four weeks.  (Tr. 368.)

On March 21, 2003, Plaintiff was examined by Melissa Johnson, D.O., whose notes indicated that she had seen Plaintiff for an acute visit "some time back."  Plaintiff reported having trouble with migraines and had been dealing with Dr. Johnson over the phone.  Her headaches had been better since she discontinued Advil, but she reported that she still had a migraine approximately one to two times per month, causing her to leave work.  She reported fatigue and mood swings.  Plaintiff was assessed with migraine headaches, and fatigue with a history of Graves' disease, and depression.  Her p.m. treatment with Duradrin was continued, and she was started on Wellbutrin, with a follow-up scheduled for two weeks.  (Tr. 369.)

4

Plaintiff returned to Dr. Johnson on June 2, 2003, still complaining of migraine headaches. She reported that she was having migraine headaches "more often than not." Dr. Johnson discontinued Plaintiff's prescription of Propranolol, started her on Nortriptyline, and advised Plaintiff to wean herself off of Zoloft. Dr. Johnson also refilled Plaintiff's Zantac prescription for GERD, and prescribed Lorazepam for use on an as needed basis. (Tr. 370.)

On June 13, 2003, Plaintiff reported to Dr. Johnson that she had been doing "okay" since she was weaned off of Propranolol. She had a recent headache that went away with ibuprofen, but now had a headache that would not go away. Plaintiff was assessed with a headache and prescribed Phenergan and Toradol. Dr. Johnson discontinued Plaintiff's Zoloft and advised her to begin the nortriptyline prophylaxis discussed at her last visit. Dr. Johnson ordered a CT scan of Plaintiff's head, and noted that Plaintiff's headaches had been getting worse. (Tr. 371.)

On July 8, 2003, Plaintiff reported to Dr. Johnson that the frequency of her headaches had decreased, and her relief was quicker after taking Duradrin. She reported a lot of stress in her life, including having to change jobs, not liking her current job, financial troubles, and being a single parent. She stated that 50 mg of Zoloft seemed to be making a difference. Dr. Johnson noted that the CT of Plaintiff's brain had been negative, continued Plaintiff on Zoloft and Nortriptyline, and restarted Propranolol for prophylaxis. Dr. Johnson also continued Plaintiff's Zoloft for her anxiety, started Plaintiff on Lorazepam, and recommended counseling. (Tr. 372.)

On September 2, 2003, Dr. John's notes reflect Plaintiff's report that her job was very stressful, she was having problems with her supervisor, she was crying all the time, and had been taking Lorazepam at least four times a day for the past few weeks. Plaintiff was assessed with worsening depression and anxiety, despite treatment. Dr. Johnson discontinued Zoloft and Wellbutrin, decreased her Lorazepam, and started Plaintiff on Effexor, in increasing dosages. She also started Plaintiff with in-office counseling, and discussed the need for Plaintiff to find a counselor outside of the office to be seen within the next month. Plaintiff was given a leave of absence from work for the next week while changing her medications, and scheduled her for follow-ups during that time. (Tr. 373.)

On September 11, 2003, Dr. Johnson noted that Plaintiff felt "somewhat better" on the Effexor, and had less crying spells and anxiety. She had been able to not use any Lorazepam over the past week, and found counseling very beneficial. Dr. Johnson increased Plaintiff's Effexor prescription. (Tr. 374.)

Plaintiff was examined by James Lord, M.D. on June 28, 2004. Dr. Lord's notes indicated a history of hyperthyroidism, migraine headaches, and sinusitis. Plaintiff reported that her migraine headaches had improved, and good tolerance to her medications. Dr. Lord noted that Plaintiff's hyperthyroidism had improved and was asymptomatic on medication, her migraine headaches were stable and she needed a new prescription for Duradrin. Plaintiff was instructed to return for a follow-up in six months. (Tr. 377-79.)

On July 16, 2004, Plaintiff presented to Dr. Lord with the chief complaint that she

wanted to apply for disability benefits. Plaintiff reported that she was having difficulty remaining employed because of a history of frequent work absences due to her recurring headaches. She was a single mother with no immediate social supports, and had been forced to miss work at several different jobs in the past several years due to either her own medical problems, or those of her daughter. She reported feeling under constant stress and had frequent feelings of anger, but not violence. Dr. Lord noted that Plaintiff's migraine headaches had not changed, but she had been experiencing more of them recently, and stress was a trigger. Plaintiff reported good tolerance to her medications and she was following the medications prophylactically. Plaintiff was assessed with worsening migraine headaches. (Tr. 361-62.)

On July 23, 2004, George Pelican, M.D. performed an endoscopy on Plaintiff, who had been complaining of heartburn and epigastric distress. Dr. Pelican noted that her stomach appeared normal, and that he did not see any heartburn. Plaintiff was given samples of a proton pump inhibitor to address the anticol-allergic effect that Effexor and Nortryptoline have on the stomach, as well as the delayed gastric emptying that they cause. (Tr. 355-60.)

On October 4, 2004, Dr. Lord noted that Plaintiff's hyperthyroidism was in remission and other than some recent weight loss and occasional palpitation, was otherwise asymptomatic. He also noted that Plaintiff's depression remained stable. (Tr. 353-54.)

Plaintiff was next examined by Lloyd Das, M.D., with Mercy Family Medicine, on

April 14, 2005.  Dr. Das noted that Plaintiff was experiencing some increased nervousness and heat intolerance with her hyperthyroidism, and increased Plaintiff's dosage of Propranolol to alleviate these symptoms.  He also noted that Plaintiff's affective disorder remained stable, but her migraine headaches had worsened.  Plaintiff had discontinued her Nortriptyline because it made her drowsy in the morning.  Dr. Das prescribed Nortriptyline for Plaintiff's migraines and discussed starting medication earlier in the evening.  (Tr. 351-52.)

On June 27, 2005, Dr. Das noted that Plaintiff's affective disorder remained stable, her migraine headaches had improved, and her GERD symptoms had improved.  Plaintiff reported that she had not experienced complications from her medications, but she had anxiety over losing her insurance.  (Tr. 347-48.)

On February 13, 2006, Plaintiff saw Dr. Mertens, with Mercy Family Medicine, for a follow-up evaluation on her medication and insurance.  Dr. Mertens noted that Plaintiff's depression was "not doing great," her house was under foreclosure, her income was down, and her boyfriend also struggled with depression.  Plaintiff reported that ibuprofen was not providing much relief for her migraines, and she was having more than one migraine a week.  Dr. Mertens restarted Propranolol and noted that Plaintiff needed more time on prophylactic therapy.  (Tr. 343-46.)

On March 25, 2006, Plaintiff completed a Function Report on herself.  Plaintiff described her typical day as taking her daughter to school, going to work, picking her daughter up after work and taking her to dance class or softball practice, and trying to

keep up with the house cleaning and laundry in between. She stated that she supported and took care of her 11-year-old daughter, as well as taking care of their pets. On some days, she stated that she could not get out of bed because the depression and migraines made her tired, and she had no energy to do more than she was already doing. Her illness affected her sleep such that she could only sleep a few hours at a time. She prepared her own meals, and tried to keep up on housework by doing something for at least one hour every day, such as dishes, mopping, laundry, or vacuuming. She went outside every day, unless she had a migraine, in which case she stayed in the dark. She was able to go out alone, drive, go shopping, pay bills, and read. Plaintiff stated that she participated in her daughter's dance class and softball practice, but was usually late because when she fell asleep it was difficult to wake up. She also had difficulties lifting, squatting, kneeling, understanding, completing tasks, concentrating, and remembering, because of her illness. (Tr. 160-67.)

On April 20, 2006, a Psychiatric Review Technique form was completed by medical consultant Judith A. McGee, Ph.D., which indicated that Plaintiff was suffering from Affective Disorders, but that her impairment was not severe. None of the check boxes under the heading "Affective Disorders" were marked, but the form indicates that Plaintiff's depression was diagnosed by her primary care physician. None of the boxes under the heading "Anxiety Related Disorders" were marked. The rating of Plaintiff's functional limitations indicated that there were no restrictions on her daily living activities and that she suffered no episodes of decompensation that were of extended duration.

Plaintiff's difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, were each rated "mild." Dr. McGee's notes indicated that Plaintiff's affect disorder was stable with medication and that Plaintiff was able to work part time, shop, drive, pay bills, complete household chores, maintain a household independently, and care for her 11 year old daughter. The notes also stated that Plaintiff reported difficulty with paying attention, memory, completing tasks, and getting out of bed at times. Dr. McGee found these allegations to be reasonable, and found that Plaintiff's depression was non-severe because it did not significantly interfere with functioning. (Tr. 387-400.)

On April 25, 2006, Patricia Meegan, Plaintiff's aunt, completed a Third-Party Function Report on Plaintiff. Ms. Meegan had known the Plaintiff her entire life, and saw her once a week for a few hours, in addition to all of the holidays. Ms. Meegan's description of Plaintiff's functioning was largely similar to Plaintiff's March 25, 2006 Function Report, but also noted that Plaintiff's medication made her restless, such that she was unable to sleep at night, and her concentration was not as good as it was before her illness. Ms. Meegan also noted that Plaintiff did not want to go to family functions or be around anyone anymore because she felt that no one liked her. She was also late for everything, and according to Ms. Meegan, her illness seemed to occupy most of her time. (Tr. 186-193.) On April 26, 2006, Joyce Lazier, Plaintiff's mother, completed a Third-Party Function Report on Plaintiff, which echoed Ms. Meegan's statements. (Tr. 194-201.)

On May 18, 2006, Plaintiff was examined by Mona Abousleman, M.D., having complained of back pain.  (Tr. 430-31.)

Plaintiff saw Dr. Mertens for a follow-up evaluation on June 15, 2006.  Plaintiff reported that her depression had worsened, she had anxiety, struggled with job loss and her 11-year-old daughter, and her migraine headaches had worsened.  She was experiencing migraine headaches approximately twice a week.  Dr. Mertens referred Plaintiff to Della Kinsolving Benham for counseling, continued Plaintiff's Effexor prescription, increased Plaintiff's Propranolol dosage, and started naproxen sodium as needed.  (Tr. 425-28.)

On September 8, 2006, Plaintiff was examined by Arif Habib, M.D., of Mid-American Psychiatric Consultants, LLC.  (Tr. 505.)  Dr. Habib noted that Plaintiff was being seen as an out-patient for depression, which she had suffered from for 15 years or more.  She also had a history of Graves' disease and migraines.  Plaintiff reported that she had filed for disability and started a new job.  She had anxiety and low energy, and a history of physical and sexual abuse by her ex-boyfriend.

Dr. Habib noted that Plaintiff's general appearance was calm; her mood "ok"; her memory, insight, and judgment were fair; she was oriented to time, place, and person; and her concentration was "ok."  He diagnosed Plaintiff with major depression, "rec. moderate," Graves' disease, migraines, and a Global Assessment of Functioning ("GAF")[2]

_____

[2]A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  GAF scores of 21-30 reflect behavior that is

of 55/65; he increased Plaintiff's Effexor dosage. (Tr. 505-07.)

On October 18, 2006, Plaintiff was seen by Dr. Mertens for a preventative examination, and received a PAP smear. Plaintiff reported that her GERD symptoms were much worse, that she had been out of Protonix for some time because she had not kept doctors' appointments, and that she had been using Tums without much relief. Dr. Mertens wrote Plaintiff a new prescription for Protonix and requested a follow-up visit within the next month to discuss other medication and medical issues. (Tr. 420-24.)

On October 20, 2006, Plaintiff reported to Dr. Habib that Effexor was making her more emotional. (Tr. 503.) Plaintiff reported back to Dr. Mertens on October 23, 2006 that she had seen Dr. Habib and he had started her on Lexapro and refilled her Lorazepam to help her sleep at night. Plaintiff also complained to Dr. Mertens about lower back pain, and stated that naproxyn did not do anything for her migraine headaches; Imitrex did help, but made her nauseous and dizzy; and Midrin worked previously, but her insurance wouldn't cover it. Dr. Mertens lowered Plaintiff's dosage of Imitrex, and ordered an x-ray of Plaintiff's L-S spine to rule out a compression fracture. (Tr. 415-17.) The x-ray came back negative, and Dr. Mertens prescribed physical therapy. (Tr. 418-19.) Plaintiff attended her initial physical therapy consult on November 16, 2006, but did not attend

---

"considerably influenced" by delusions, hallucinations, serious impairment in communication or judgment, or an inability to function in almost all areas; scores of 31-40 indicate "some" impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32-4.

three follow-up appointments.  (Tr. 414.)

On January 29, 2007, Plaintiff was examined by Katherine E. Huhn Usry, M.D., complaining of sinus congestion.  Dr. Huhn Usry diagnosed Plaintiff with sinusitis and prescribed amoxicillin.  (Tr. 412-13.)

On February 19, 2007, Plaintiff was seen by Dr. Mertens for a follow-up evaluation, whose notes indicated that Plaintiff was seeing Dr. Habib for her depression, and her medications were being changed.  Plaintiff reported having approximately two migraine headaches a month, but they were mostly mild and were relieved fairly quickly. She had one bad migraine headache that was associated with an upper respiratory infection and sinusitis, and had lost her prescription for Imitrex, which still made her feel nauseated.  Dr. Mertens noted that Plaintiff's hyperthyroidism and migraines were stable, and continued Plaintiff's Protonix dosage pending glucose results.  (Tr. 408-11.)

Plaintiff was evaluated by Dr. Habib on February 23, 2007.  Plaintiff reported that she had discontinued Lexapro because it made her "more verbally outspoken."  She was currently taking Effexor and Ativan (Lorazepam).  She reported that she was working and her 12-year-old daughter was "fine."  Dr. Habib noted that Plaintiff's general appearance was pleasant, her mood was "good," and his assessment of Plaintiff was "better."  He instructed Plaintiff to return for a follow-up evaluation in two months.  (Tr. 502.)

Plaintiff visited Dr. Mertens for a follow-up evaluation on May 8, 2007.  Plaintiff reported having only two migraine headaches a month since she began taking Topamax, and she had moved to taking it during the daytime due to the insomnia she experienced on

Topamax.  A 25 mg dose of Imitrex did not work, but she tolerated a 50 mg dose "ok" when needed.  She also reported that her GERD was much better since she had stopped eating so many red sauces and eating so late in the evening.  Dr. Mertens noted that Plaintiff's migraine headaches had improved, and that her medications had been changed slightly for simplicity.  She also noted that Plaintiff's GERD had improved, continued Plaintiff's medications, and noted that she would continue to monitor Plaintiff for complications.  Plaintiff was to return for a follow-up in approximately six months.  (Tr. 401-06.)

On May 18, 2007, Plaintiff returned for a follow-up evaluation with Dr. Habib. She reported having some problems at work, but stated that her 12-year-old daughter was "fine."  Her appetite was good and she was not experiencing any side effects from her medications.  Dr. Habib noted that her general appearance was pleasant; her mood was fair; her affect was appropriate; she was oriented to time, place, and person; her memory, insight, and judgment were fair; and his assessment of Plaintiff was "stable."  (Tr. 501.)

Plaintiff was examined by John Campbell, M.D., on July 24, 2007, complaining of congestion and a cough.  Plaintiff reported that her symptoms felt like another migraine, and she had not taken any home Imitrex.  Dr. Campbell noted that Plaintiff showed no signs of increased nervousness, mood changes or depression, and stated that she was "doing well."  He gave Plaintiff an injection of both Imitrex and Phenergan in the office, to help with the migraine headache and improve her nausea.  He also prescribed Phenergan and Imitrex injection solution for her migraine, and advised Plaintiff to take

14

Tylenol p.m., push fluids, and wash her hands well, to treat her diagnosed intestinal infection.  (Tr. 454-56.)

Plaintiff returned to Dr. Habib on August 24, 2007, reporting that she was having problems with a colleague at work, was experiencing anxiety and depression, and was having crying spells.  She was not experiencing any side effects due to her medication.  Dr. Habib noted that her general appearance was pleasant; her mood was "good"; she was oriented to time, place, and person; and her memory was fair.  (Tr. 500.)

On October 19, 2007, Plaintiff reported to Dr. Habib that she was "doing well," her mood was "stable," she was sleeping "good," her appetite was "good," and she was not experiencing any side effects from her medications.  Plaintiff talked about work, and also talked about her boyfriend.  Plaintiff said she had supported him for four years and he had bipolar disorder and was noncompliant with his medications.  Dr. Habib noted that Plaintiff's general appearance was pleasant; her mood "good"; her affect "bright"; she was oriented to time, place, and person; her memory was "fair"; her insight and judgment were "good"; and his assessment of Plaintiff was "stable."  (Tr. 499.)

On October 26, 2007, Plaintiff visited Dr. Mertens to receive a shot for her migraine because she reported that she was "ill all the time."   Dr. Mertens indicated that Plaintiff was suffering from migraine headaches approximately twice a month, and that her typical headache caused "tightness across the frontal area + photo/phonophobia."  Plaintiff complained of nausea with Imitrex, and noted that she was taking Topamax in the morning to avoid insomnia.  Dr. Mertens adjusted Plaintiff's dosage of Topamax, and

instructed Plaintiff to return for a follow-up evaluation in six months. (Tr. 451-53.)

On November 26, 2007, Plaintiff presented to Stephanie Liebmann, M.D., complaining of a fall that had produced pain in her wrist and flare ups of her chronic lower back pain. Dr. Liebmann ordered a series of x-rays on Plaintiff's wrist, which showed no acute fracture or dislocation. She advised Plaintiff to wear a splint continuously, apply ice packs and elevate the wrist as needed, and take 800 mg of Ibuprofen up to four times a day. She also prescribed four weeks of physical therapy for Plaintiff's back pain. (Tr. 448-50, 460.)

On July 11, 2008, Plaintiff presented to Dr. Mertens complaining of continuing depression, migraines, and insomnia. Plaintiff reported that she had "[l]ost her job" and was "[l]ooking at getting disability." She complained of depression, migraines, and "everything." She reported that Dr. Habib had increased Plaintiff's dosage of Effexor to 300 mg, and said that she was having difficulty sleeping, so she was taking Lorazepam to help her sleep. She reported migraines approximately once per month and stated that she was taking ibuprofen to avert them, with Imitrex as necessary for more severe headaches. Dr. Mertens indicated that Plaintiff appeared mildly depressed and not anxious. Dr. Mertens' diagnoses included migraines, which were described as "stable," and major depression, for which Dr. Mertens recommended continued psychiatric follow-ups and adjustments to medication as needed. (Tr. 443-46, 461.)

On July 21, 2008, Plaintiff completed a Function Report on herself. She stated that she took care of her daughter and pets, but forgot when she last showered unless

16

reminded. She prepared meals, did the dishes, mopped the floors, dusted, and did laundry, but it took her hours to complete anything and she often forgot what she was doing when she walked away from her task. She also got tired very easily. She stated that she was able to go out by herself, and drove to shop when necessary. She had to be reminded to go to doctors' appointments and to do things for her daughter. She stated that her illness had affected her memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 327-34.)

On May 16, 2008, Plaintiff was examined by Dr. Habib, and reported that she had lost her job on May 8th, had a flood in the basement, which had caused a lot of damage, and was experiencing increased depression lately. She was sleeping better with Ativan, but it made her drowsy the next day. She reported that her appetite was fair. Dr. Habib noted under general appearance that she was casually dressed. Her mood was "ok"; she was oriented to time, place, and person; her memory was "fair"; and her insight and judgment were "ok." Dr. Habib assessed Plaintiff with depression and anxiety. (Tr. 498.)

Plaintiff returned to Dr. Habib on July 18, 2008 and reported that she was feeling "alright." She was sleeping good with Ativan and her appetite was good. Dr. Habib noted that her general appearance was "fair" and pleasant; her mood was "good"; she was oriented to time, place, and person; her memory was "good"; and he assessed Plaintiff as "better." (Tr. 497.)

The record contains additional treatment notes from August 31, 2008 to September 1, 2008, which document an emergency room visit by Plaintiff wherein Plaintiff was

diagnosed with pneumonia.  (Tr. 462-89.)

On September 12, 2008, Plaintiff was examined by Dr. Habib and reported that she was doing "alright."  Her mood was more stable, she was not experiencing any side effects from the medications, and she reported that she had been in the ER the prior week with pneumonia.  Dr. Habib noted under general appearance that she was casually dressed, and noted she was oriented to time, place, and person; her memory, insight, and judgment were "fair"; and he assessed Plaintiff with major depressive disorder.  (Tr. 496.)

On October 9, 2008, Dr. Habib completed a Mental Residual Functional Capacity Questionnaire.  Dr. Habib reported that he saw Plaintiff every two months.  Plaintiff was diagnosed with major depression, recurrent, moderate; Graves' disease; and migraines, with a GAF of 55.  Her prescribed medications included Buspar, Effexor, Ativan, and Trazadone, with no reported side effects.  Dr. Habib reported that with medication management, Plaintiff's mood was more stable, but that she had an increase in anxiety.  Dr. Habib also reported that Plaintiff's speech had a regular rate and rhythm, her affect was appropriate, her thought process was normal, she was oriented "x3," and her memory, insight, and judgment were fair.  He reported a prognosis of "guarded."  Dr. Habib identified Plaintiff's signs and symptoms as generalized persistent anxiety and memory impairment.  Dr. Habib noted that he had "not observed" Plaintiff's mental abilities and aptitudes needed to do unskilled work and therefore did not complete that section of the questionnaire.  Dr. Habib reported that Plaintiff was not a malingerer, and that her impairment lasted, or could be expected to last, at least 12 months.  (Tr. 490-495.)

Plaintiff returned to Dr. Habib on November 21, 2008, and reported doing "alright." She was sleeping "alright" and her appetite was "fair," but she was still unable to sleep without Ativan and she stated that she did not like Trazadone. She reported her anxiety was "better." Dr. Habib noted that her mood was "fair"; her affect "appropriate"; she was oriented to time, place, and person; her memory, insight, and judgment were "fair"; and he assessed Plaintiff with major depressive disorder. He increased her dosage of Buspar, continued Effexor and Ativan, and discontinued Trazadone. (Tr. 514.)

Plaintiff was examined by Dr. Mertens on December 1, 2008, for a follow-up evaluation. Plaintiff complained of awakening during the night, not wanting to be in crowds and around people, a recent flu-like illness, very severe migraines, and being unable to hold down her medications. Dr. Mertens noted that Plaintiff's primary diagnosis was Graves' disease, with migraines and esophageal reflux; performed diabetes mellitus screening, a routine gynecological exam, and cervical cancer screening; and noted Plaintiff's need for an influenza vaccine. She also recommended that Plaintiff continue her psychiatric care, and avoid large or late meals. (Tr. 342-79.)

**Evidentiary Hearing of January 6, 2009 (Tr. 23 -75)**

Plaintiff, who was represented by counsel, testified that she was 36 years old, unmarried, and had a 12th grade education with some vocational training in the use of Microsoft Windows and Excel. She stated that her migraines and Graves' disease can impact her ability to lift items. She stated that she could read, write, perform simple arithmetic, and "make change." She was currently drawing unemployment compensation

benefits, which she had been receiving since she last worked in May 2008. She lived with her 13 year-old daughter. She stated that she was not currently on Medicaid. She indicated that she had to represent to the Unemployment office that she was still looking for work, and that she had stated to them that she was still able to work.

Plaintiff testified that her last employment was with Dent Wizard in the cash department. Plaintiff testified that she was discharged for allegedly stealing company time by clocking in and failing to report back to her desk for 24 minutes. Plaintiff indicated that she had problems with timeliness while working at Dent Wizard and that she had disagreements with two co-workers who shared her office, but that she got along well with her bosses and the 50 other employees who worked there. She described her job duties as handling deposits through the online banking system, and indicated that her job was mostly sedentary except for lifting boxes that weighed about 30 pounds approximately once a month. She stated that she did not have any problem lifting the boxes as long as she avoided using her legs "so much."

Prior to working at Dent Wizard, Plaintiff worked as a waitress at T.G.I. Friday's for approximately four months, where she was responsible for serving food and operating the cash register. Before that, she worked at Red Lobster for approximately six months, where she was responsible for doing preparation work in addition to serving food and operating the cash register. She estimated that she had to lift 20 pounds frequently, and that 20 pounds was also the maximum weight that she had to lift. She stated that she was discharged from Red Lobster for problems with tardiness and because one day she called

in sick with a migraine and could not find someone to cover her shift.  Prior to working at

Red Lobster, Plaintiff worked as a waitress at Applebee's, where she was required to carry

approximately 30 pounds at most.

Before she worked as a waitress, Plaintiff stated that she worked as a claims

representative for a company that processed unemployment claims for approximately two

years.  She stated that she left this job because she was having a hard time coping with

stress and migraines, which caused her to take a leave of absence.  She said she was

discharged after returning to work because of alleged poor work performance.  Prior to

that, she worked as a purchasing representative for a chemical company for two years until

the company was bought out and her job was eliminated.  She testified that her position

with the chemical company was entirely sedentary.  Prior to that, she worked as an

accounts receivable and payable clerk for two years, a position which required her to lift

boxes of paper that weighed up to 50 pounds on a weekly basis.  Plaintiff stated that she

was discharged from this position because of tardiness and explained that her Graves'

disease had just been diagnosed at this time, so she was going to the doctor frequently and

taking numerous medications.

Before she worked as an accounts receivable clerk, Plaintiff worked as an assistant

general manager for Hampton Inn for approximately one year.  In this position, she had

approximately 20 employees under her and she had the authority to hire and fire them, as

well as to assign their duties.  Plaintiff stated that she was discharged from this position

because of her work performance.  Before that, she worked as a front office supervisor for

the Holiday Inn for a year, which was a supervisory position and largely sedentary, but without the authority to make hiring decisions and set employee schedules. Before that, Plaintiff worked for eight years at Quality Hotel, beginning when she was a senior in high school up until she had her daughter in 1995. Plaintiff stated that she began working there as a desk clerk, then became a night auditor for three years, and eventually was promoted to front office supervisor, where she managed between 15 and 20 employees with the authority to hire and fire them. She indicated that after returning to work following her daughter's birth, her job had been eliminated, so she collected unemployment compensation for six months before going to work for a Holiday Inn.

Plaintiff described her difficulty working by stating that the medications she was taking made it difficult for her to get up on time in the morning. She frequently experienced unexplained crying spells and sudden, debilitating migraines. Plaintiff's depression caused her to avoid being around people and to stay at home whenever possible. Plaintiff stated that she felt defeated by her inability to maintain employment. She indicated that her Graves' disease was largely under control with medication, but that her migraines were unpredictable and usually left her incapacitated for a day or more. Plaintiff said that she was taking Imitrex to treat her migraines, but sometimes it did not work and she had to go to her doctor's office for a shot. She stated that she had gone to the emergency room for her migraines before, but had never been hospitalized. Plaintiff described her depression as making it difficult for her to get out of bed and causing her to limit her social interactions as much as possible. Plaintiff stated that she was taking

Effexor for her depression.

Plaintiff stated that she had recently been tested for diabetes, but she had not received any report stating that she had diabetes. She also suffered from esophageal reflux, which she was mostly able to control by taking medication. When asked to describe her daily activities, Plaintiff stated that she picked up her daughter and took her to dance practice, softball, and soccer games. She indicated that she still did the laundry and took care of her two dogs, but that she was behind on these chores. Plaintiff stated that she could physically walk and stand without problems, other than being winded after walking, and that she could lift approximately 25 pounds, although it was difficult for her to estimate exactly how much she could lift because she was recovering from a fractured wrist, which she sustained some time prior to Christmas 2008. Plaintiff stated that she did not smoke, drink, or do illegal drugs, and that she drove, did dishes, did laundry, and vacuumed, but did not do any chores outside the house, such as mowing the yard.

Plaintiff's counsel began her examination by asking if Plaintiff wanted to work, to which Plaintiff replied that she did want to work but felt like she would be incapable of holding a job in her current state. Plaintiff stated that she did not get dressed or bathe daily, frequently left the house only to pick up her daughter from school, and that she occasionally would forget to take a shower until her daughter told her that she smelled. She stated that her current weight of 230 pounds was far above her normal weight of 170 pounds, and estimated that she had gained 60 pounds because of inactivity and failure to watch what she was eating, although she believed it could also be a side effect of her

medications.  She indicated that her medications caused dizziness and drowsiness and that she would plan her medication schedule around whether she needed to drive or not because she did not want to be disoriented behind the wheel.

Plaintiff recounted that she was dismissed from her last job for allegedly stealing company time, then explained that she had not been stealing time, but was instead taking her break immediately after she clocked in.  She indicated that she had been with another employee the whole time who engaged in a similar practice, and that employee was promoted rather than being fired.  Plaintiff stated that her record of being tardy was due to her medication, which made it difficult for her to get up on time in the morning.  When she didn't take her medication, she was unable to sleep much at all, but when she did take it, she was prone to oversleep and frequently felt tired the following day.  Plaintiff indicated that she usually took a nap every day.

Plaintiff indicated that she had problems with her manager when she worked as an accounts receivable and payable clerk.  Plaintiff stated that she "felt like they were picking on me" when her manager requested that she cover up her tattoo at work.  She indicated that she had felt the same way at her last job with Dent Wizard.  She believed that she generally got along well with others, and she described herself as having conflicting emotions about indicating on her unemployment application that she was able and available to work.  She said that the unemployment office told her she would have to indicate that she was able and available in order to make her claim go through, since she had not qualified as disabled.  Plaintiff stated that she wanted to work, that she would try

to do a job if she got one, and that she had tried to do her last job with Dent Wizard.

Plaintiff stated that she had begun seeing Dr. Habib at the advice of Dr. Mertens in 2007, while she was having problems at work. Dr. Habib diagnosed her as being highly depressed and prescribed Effexor for treatment. He subsequently added Buspar to treat her anxiety. Plaintiff believed the medications were helping her, particularly by reducing her crying spells to approximately once a week. Plaintiff indicated that these crying spells could last for days, during which time she felt overwhelmed. Plaintiff stated that she was filing for bankruptcy, and that she was not receiving any child support from the father of her child.

Plaintiff's counsel inquired about her migraines, and Plaintiff responded that she had been taking two preventative medications, which kept the migraines under control, but since she lost her health insurance in November 2008, she could no longer afford those medications. She was currently using ibuprofen and Imitrex to relieve her migraines. Plaintiff testified that she tried to attend as many of her daughter's games as she could, but her migraines sometimes prevented her from going. She indicated that when she did go to her daughter's sporting events, she frequently sat by herself to avoid other people. She stated that she had become increasingly suspicious that people were lying to her. She stated that she occasionally went out with her mother to a restaurant, to the grocery store or to gamble on a boat, but she had been doing less of that within the year prior to the hearing. She testified that she went out to gamble on a boat approximately once every month, but only when her mother requested that Plaintiff go with her. Plaintiff indicated

that she would usually take an extra anxiety pill before going out to ensure that she stayed calm in public.

Plaintiff indicated that she spent a lot of time with her daughter, and that her daughter also stayed with Plaintiff's mother on occasion. When her daughter was gone, Plaintiff spent most of her time reading, eating, or sleeping.

The VE reviewed Plaintiff's work history beginning with her position as a night auditor, which was sedentary and skilled. Her position as a front office supervisor and assistant general manager in the hotel business was classified as light and skilled, although it may have been medium as performed by Plaintiff. Plaintiff's work as an accounting clerk was classified as sedentary and skilled in the national economy, but medium and skilled as Plaintiff performed the job. Plaintiff's work as a purchasing agent was sedentary and skilled as she performed it, although it was light and skilled in the national economy. Plaintiff's job as a waitress was classified as light and semi-skilled, although it could be classified as heavy as Plaintiff described it. Plaintiff also reported working as a cashier, which was light and unskilled; bussing tables, which was medium and unskilled; working as a claims representative, which was sedentary and skilled; and doing temporary clerical work, which was light and semi-skilled.

The VE testified that Plaintiff had acquired several skills that could be useful in other jobs, including computer training, office skills, hiring/firing skills, ordering skills, math skills, general problem solving skills, and some customer service skills. The VE testified that an individual with Plaintiff's education, training, work experience, and full

light duty abilities, who could respond appropriately to supervisor and coworkers in a task oriented setting, perform repetitive work according to set procedures, sequence, or pace, and who could not perform some complex tasks, could not perform any of Plaintiff's exact past jobs, but could perform similar jobs such as cafeteria attendant, light stock worker, or laundry worker. The VE testified that each of those jobs was available in both the local and national economies.

The VE then stated that an individual with all of the abilities in the first hypothetical, who could respond appropriately to supervisors and coworkers in a task oriented setting where contact with others is casual and infrequent, adapt to routine simple work changes, perform repetitive work according to set procedures, sequence, and pace, and perform some complex tasks, would be able to perform the same jobs as a light stock worker or laundry worker, as well as the job of assembly worker, which was available in both the local and national economies. The VE then stated that if the individual in hypothetical two had up to four absences per month for medical reasons, she would not be able to maintain a job. Similarly, the VE stated that an individual with Plaintiff's age, education and work experience, who would have approximately 20 tardys in a two month period, would not be able to maintain a job.

## ALJ's Decision of October 4, 2006 (Tr. at 14-21)

The ALJ stated that Plaintiff had not engaged in Substantial Gainful Activity ("SGA") since her amended alleged onset date of May 8, 2008. He noted that she had originally alleged an onset date of July 1, 2004, but that she had returned to work after the

original alleged onset date and had earnings above the amount presumptively indicative of SGA in the first and second quarters of 2008. He then found that she suffered from the following severe impairments: migraine headaches, a mood disorder, and Graves' disease. The ALJ noted that Plaintiff's Graves' disease had been asymptomatic for years, that her migraines had recently been reported as "stable," and that her treating psychiatrist had evaluated her as having a GAF of 55 and "speech at a regular rate and rhythm, an appropriate affect, normal thought processes, fair memory, and fair insight and judgment." The ALJ noted that Plaintiff's treating psychiatrist did not provide an assessment of her specific mental abilities/aptitudes for unskilled work, stating that he had not observed such abilities/aptitudes.

The ALJ determined that Plaintiff's depression did not meet or medically equal a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ then proceeded to find that Plaintiff possessed the Residual Functional Capacity ("RFC") to perform light work except that she is limited to working in settings where contact with others is casual and infrequent; she is expected to adapt only to routine/simple work changes; she is expected mostly to perform repetitive work according to set procedures, sequence or pace; and she is limited to infrequent complex tasks.

After considering the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but the ALJ determined that her statements regarding the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent

with his RFC assessment. The ALJ stated that the most significant factor in regard to the credibility of Plaintiff's allegations was the fact that she had worked full time in the not-too-distant past, and that she had testified that she had been let go due to reasons other than her health conditions, principally because she was alleged to have been stealing company time by signing in for work but not starting to work for a period of time. The ALJ also noted that Plaintiff was currently collecting unemployment benefits, which required her to assert that she was able to work.

The ALJ stated that medical records showed that Plaintiff's conditions were under good control. Her Graves' disease was asymptomatic and under control with medication; her migraines were stable with medication. While stating that his treatment notes were "basically illegible," that ALJ noted that Plaintiff's treating psychiatrist had not offered an opinion on the effect that Plaintiff's depression and anxiety symptoms would have on her ability to perform the mental demands of work activities. The ALJ stated that Plaintiff's "substantial" daily activities, including housework and caring for her teenage daughter, suggested that she was capable of simple, light work activities. The ALJ also noted that, although Plaintiff reported problems sleeping, she was taking medication to assist her in sleeping and her treating psychiatrist's medical source report did not report any side effects. The ALJ stated that Plaintiff had demonstrated that she was able to transport herself in the course of performing her daily activities. Finally, the ALJ indicated that he had not given much weight to the RFC assessment completed by Dr. Habib because he had declined to assess Plaintiff's ability to perform the mental demands of unskilled work.

The ALJ found that, based on the VE's testimony, Plaintiff was not able to perform any of her past relevant work, but he determined that there were jobs existing in significant numbers in the national economy that someone of Plaintiff's age, education, work experience, and RFC could perform. The ALJ indicated that Plaintiff's limitations affected her ability to perform a full range of light work, but based on the VE's testimony, Plaintiff was still able to perform the requirements of representative occupations such as stocker, launderer, and assembler. Therefore, based on the VE's testimony, and considering Plaintiff's age, education, experience, and RFC, the ALJ found that she was not disabled as defined by the Social Security Act.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an

opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)
(citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any
substantial gainful activity which exists in the national economy, by reason of a medically
determinable impairment which has lasted or can be expected to last for not less than 12
months.  42 U.S.C. § 423(d)(1)(A).  Both the impairment and the inability to engage in
substantial gainful employment must last or be expected to last for not less than 12
months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520,
establishing a five-step sequential evaluation process to determine disability.  The
Commissioner begins by deciding whether the claimant is engaged in substantial gainful
activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant
has a "severe" impairment or combination of impairments.  A severe impairment is one
which significantly limits a person's physical or mental ability to do basic work activities.
20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration
requirement, the claim is denied.  If the impairment or combination of impairments is
severe and meets the duration requirement, the Commissioner determines at step three
whether the claimant's impairment meets or is equal to one of the deemed-disabling
impairments listed in Appendix 1.  If not, the Commissioner asks at step four whether the
claimant has the RFC to perform her past relevant work as she actually performed it, or as

generally required by employers in the national economy.  If so, the claimant is not disabled.  If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.

## ALJ's Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ's decision is not based upon substantial evidence because the ALJ found Plaintiff's prior work history to be a significant factor in detracting from, rather than supporting, her credibility.  Specifically, the Plaintiff refers to the following language from the ALJ's decision:

> The most significant factor in regard to the credibility of the claimant's allegations is the fact that the claimant worked full time at the substantial gainful activity level in the not-too-distant past and that the claimant's job ended for reasons other than her alleged health complaints.  (Tr. 19.)

Where an ALJ explicitly discredits a claimant's testimony for stated reasons, the court normally defers to the ALJ's determination of credibility.  See Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991).  The primary question is not whether the claimant experiences the symptoms alleged, but whether it is credible that they are of the severity to prevent her from performing any type of work.  See McGinnis v. Chater, 74 F.3d 873, 874 (8th Cir. 1996).

In order to properly evaluate subjective claims of pain, the ALJ is required to take into account the claimant's work history and limitations of her daily activities.  See

Jenkins v. Apfel, 196 F.3d 922, 926 (8th Cir. 1999) (finding that Jenkins' current limited activities supported his claims of disabling pain in light of his past hard-working lifestyle); O'Donnell v. Barnhart, 318 F.3d 811, 816-817 (8th Cir. 2003) (finding that O'Donnell's fourteen-year record of responsible and well-paying jobs in the computer field supported her credibility).  An ALJ cannot presume that a claimant who continued working in spite of her limitations is not disabled, because to do so would unfairly shift the burden of proof back onto the claimant at a point in the proceedings when the burden rightfully belongs on the Commissioner.  See Kelley v. Callahan, 133 F.3d 583, 586, 588 (8th Cir. 1998) (finding that the record showed that Kelley's continued employment was only through the good graces of her employer, who made accommodations to allow Kelley to lie down several times a day on a cot that was provided for her, and her work responsibilities had been largely passive).

The record demonstrates that Plaintiff worked to support herself and her daughter, and based on her personnel file from Dent Wizard, Plaintiff was at risk of being discharged during most of her employment due to attendance issues, which Plaintiff claims were due to her medically determinable impairments.  (Tr. 57, 264-300.)  In addition, the VE testified that Plaintiff "couldn't maintain any unskilled work" with 20 tardies in a two month period, which was the basis of one of her disciplinary actions at Dent Wizard.  (Tr. 74, 280.)  Therefore, the ALJ erred in discounting Plaintiff's testimony based upon her continued employment prior to filing her disability claim.

Conversely, the record supports the ALJ's assignment of significant weight to the

fact that "the claimant's job ended for reasons other than her alleged health complaints."

(Tr. 19.)  Dent Wizard's Termination Data Form states that Plaintiff was terminated for

"Misconduct/Policy Violation" because she clocked in at 12:08 p.m., but did not return to

her work station until 12:32 p.m., "which is considered stealing company time."  (Tr.

211.)  The record thus supports the ALJ's finding that the Plaintiff was not terminated

because she was unable to work due to her alleged health complaints.

The Court finds that the ALJ's decision was based upon substantial evidence

despite the fact that the ALJ erroneously discounted the Plaintiff's testimony based upon

her continued employment prior to filing her disability claim, because this was just one of

many factors that contributed to the ALJ's decision.  As discussed above, Plaintiff was in

fact terminated from Dent Wizard for a reason not related to her alleged health complaints.

Plaintiff's Graves' disease had been essentially asymptomatic for years with medication.

And while Plaintiff had a long history of problems with migraines, treatment notes from

2007 and 2008 reflect that her migraines had become stable with medication.  Plaintiff's

treating psychiatrist did not provide an opinion on Plaintiff's mental abilities and aptitudes

needed to do unskilled work, and treatment notes from 2008 contain notes that Plaintiff

was better, was feeling "alright," and that her mood was stable.  Moreover, the Eighth

Circuit has frequently affirmed the ALJ's determination of no disability where, as here, a

plaintiff's GAF score of 55 indicated a moderate, rather than marked, limitation under the

Commissioner's regulations, and the ALJ included mental limitations in his RFC.  See

Lacroix v. Barnhart, 465 F.3d 881 (8th Cir. 2006); Gragg v. Astrue, No. 09-3238, 2010

WL 3075713 (8th Cir. Aug. 9, 2010); <u>Dantzler v. Astrue</u>, No. 4:09CV00794-DJS, 2010 WL 2990142 (E.D. Mo. July 8, 2010).

The ALJ also noted that Plaintiff's daily activities were inconsistent with her complaints of disabling pain. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148-49 (8th Cir. 2001) (finding that upon a review of the entire record, the fact that Johnson was able to carry on a normal life contributed to the ALJ's finding that his impediments were not disabling). <u>See also</u> <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 (8th Cir. 2000) (finding that evidence that Young cooked, cleaned, did laundry, shopped, studied Russian, exercised, and functioned as the primary caretaker for her home and two small children, further confirmed Young's ability to work on a daily basis in the national economy). The record demonstrates that Plaintiff cared for her teenage daughter and pets, washed laundry and dishes, vacuumed, went shopping for groceries and clothing, and occasionally went out to dinner or on the casino boat, and was able to stand, walk, and lift 25 pounds. (Tr. 50-54, 66-67, 160-67, 186-201, 327-38).

Finally, the Plaintiff testified that she applied for, and received, unemployment benefits after her amended alleged disability onset date. (Tr. 31.) A claimant who applies for unemployment compensation benefits holds herself out as available, willing, and able to work. Because such an application necessarily indicates an ability to work, it is evidence which negates Plaintiff's claim that she was disabled. <u>See</u> <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1074 (8th Cir. 1991). Additionally, in December 2008, Plaintiff informed

Dr. Mertens that she was applying for jobs on a daily basis. (Tr. 516.) This act of searching for work is inconsistent with Plaintiff's allegation of disability.

Accordingly, the Court finds that the ALJ's decision was based upon substantial evidence.

## ALJ's Development of the Record

Plaintiff argues that the ALJ erred in failing to contact Dr. Habib for further information after determining that his treatment notes were "basically illegible." (Tr. 17.) The ALJ's duty to fully develop the record may include re-contacting a treating physician for clarification of an opinion, but that duty arises only if a crucial issue is undeveloped. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).

In this case, Dr. Habib's RFC assessment indicated that he had not observed Plaintiff's ability to perform the mental demands of unskilled work and declined to provide an assessment of Plaintiff's work-related mental limitations. (Tr. 491-95). Accordingly, the ALJ afforded Dr. Habib's assessment little weight because Dr. Habib had not observed Plaintiff's ability to perform the mental demands of unskilled work (Tr. 20, 493).

However, consistent with the ALJ's RFC assessment, Dr. Habib's RFC assessment indicated that Plaintiff had normal speech, normal thought process, appropriate affect, fair memory, and fair insight and judgment (Tr. 17, 20, 491). Additionally, although the ALJ stated that Dr. Habib's treatment notes were largely illegible, upon closer examination, Dr. Habib's treatment notes from the relevant time period reflect mental status examination

findings similar to those contained in his RFC assessment. (Tr. 17, 496-98, 514). As the record contained Dr. Habib's treatment notes and RFC assessment, it is unclear what additional evidence the ALJ could have obtained from Dr. Habib by re-contacting him. The ALJ's decision is supported by substantial evidence and there is no indication that the ALJ felt unable to make the assessment he did based on the evidence in the record (Tr. 18-20). See Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005) (finding that the ALJ did not fail to fully develop the record where there was no indication that the ALJ felt unable to make the assessment he did and his assessment was supported by substantial evidence). Thus, the ALJ was not required to re-contact Dr. Habib.

## CONCLUSION

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citation omitted). "'If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's findings, [the court] must affirm the denial of benefits.'" Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Based on the record as a whole, the Court believes that the ALJ's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be

**AFFIRMED**.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 8th day of October, 2010.